## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **ROBERT LEONARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 07-CV-2172** |
| | ) | |
| **EASTERN ILLINOIS UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

On September 21, 2007, Plaintiff Robert Leonard filed a Complaint (#1) alleging that Defendant, Eastern Illinois University (EIU), violated the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 when he was denied a promotion at work. Defendant filed its Answer and Affirmative Defenses (#11) on November 19, 2007. Defendant filed a Motion for Summary Judgment (#23) on February 9, 2009. Plaintiff filed his Memorandum in Opposition (#27) on April 2, 2009. Defendant filed its Reply (#29) on April 16, 2009. The motion is now fully briefed and ripe for a ruling. For the following reasons, Defendant's Motion for Summary Judgment (#23) is GRANTED.

### FACTUAL BACKGROUND

The following facts are taken from "Statement of Material and Undisputed Facts In Support of Defendant's Motion for Summary Judgment" filed by Defendant that have not been objected to by Plaintiff, the deposition testimony of Plaintiff and others, and from exhibits filed as attachments to the filings in this case.

Plaintiff, a Native American, was hired by Defendant in 1987 under the Learner's Program, a program to hire women and minorities and people with handicaps at EIU. Plaintiff suffers from retrograde amnesia as the result of a severe closed head injury occurring in 1987. Plaintiff was hired as a building service worker. He worked at EIU for six months before resigning and moving to Michigan with his wife. Plaintiff was rehired at EIU in August 1991 under the same Learner's Program. After completing a probationary status of six months, he was considered a full status employee. He was again a building service worker, at which position he worked from 1991 until his resignation on February 26, 2008.

Plaintiff is a Native American through his father's family history and believes his father was enrolled as a member of the Saginaw Tribe. Plaintiff has never sent in letters to be enrolled as a tribe member himself due to his personal beliefs, but this lack of enrollment does not preclude him from being considered a Native American. No documentation exists that he is a member of a tribe except for his father's enrollment and his father's family documentation as to that status.

From 1987 to 2008 Plaintiff estimates that he has participated in four or five interviews for a promotion to Building Services Subforeman and that in the last five years he has participated in three interviews for a promotion. However, he estimates that he has missed approximately three to five interviews. Unlike a building service worker, a Building Service Subforeman does inventories and checks up on the work of others. In fact, a week prior to the March 2005 interview he missed an interview for the same position. Plaintiff's father was sick at the time and he called ahead to cancel the interview.

In March 2005, he did attend an interview for a promotion to Building Services Subforeman. The six interviewers sitting on the interview panel were: Valerie Leonard (no relation), Kevin

Larkin, Steve Gilbert, Herb McElwee, Travis McGee, and John Sigler. Each interviewer had a equal role in the decision-making process of choosing an individual for promotion to subforeman. Plaintiff knew all of the interviewers and had worked with them prior to his interview. When Plaintiff arrived at the interview, two of the interviewers, McElwee and Magee, took off their jackets and were wearing Chief Illiniwek shirts. The interview occurred on March 24, 2005, the same day the University of Illinois men's basketball team was playing in the Sweet 16 of the NCAA Basketball Tournament. During this time there were a lot of Illini fans in Champaign and Charleston, Illinois, including on EIU's campus. In the spring of 2005, it was common to see people in public wearing clothing in support of the men's basketball team and Chief Illiniwek as well.

Plaintiff claimed that he was surprised that Magee and McElwee were wearing the Chief Illiniwek (the Chief) shirts because of his extreme distaste for the symbol. Plaintiff felt that it was extremely inappropriate for them to display such things at an interview for a promotion. Plaintiff knew there were other opinions concerning the Chief even in the Native American community. Plaintiff claims a coworker told him that he overheard Magee and McElwee saying that they will wear their Chief stuff no matter what Plaintiff likes or what he thinks. Plaintiff claims he heard about Magee and McElwee's statements regarding the Chief just prior to Plaintiff's interview. Plaintiff believed that when Magee and McElwee wore the shirts it was directed at him. Plaintiff believed this because of comments he heard about what Magee and McElwee were going to do from the unknown coworker. Despite hearing from that coworker about Magee and McElwee's plans to wear the shirts, Plaintiff was still surprised they wore them and thought it was unprofessional because they knew of his feelings about racial mascots. Other than McElwee and Magee, none of the other interviewers were wearing Chief shirts.

The interview was directed towards Plaintiff's role as a building service worker. All of the questions during the interview were directed towards the job Plaintiff was seeking and how he would perform in that position. The same questions were asked of all the applicants and none of the six members of the interview panel had anything to do with drafting the questions. Labor relations and human resources had something to do with writing the questions and selecting the criteria for selecting a subforeman. The interviewers on the panel usually did not deviate from the set questions they were given. Plaintiff did not have any knowledge as to how the other candidates for the promotion performed in their interviews, but felt that he did not perform well in his because he was angry and that was how he came across. He also did not know how Magee and McElwee rated him in his interview nor does he know how he was evaluated compared to the other candidates.

To make a decision on who would be selected for a subforeman position, each candidate was scored on the basis of five different categories: (1) related work experience; (2) supervisory experience; (3) ability to work with and lead others; (4) problem-solving ability; and (5) attendance at work. For each of those categories an individual could receive 1 to 5 points with 1 being the minimum and 5 being the maximum. All the scores would be totaled up for a total score of between 5 and 25 points. After every interviewer has scored the applicant, there is a discussion about said applicant, but no one changes their scores. The interviewers score applicants based on how the interviewer felt the applicant answered the questions. All of the interviewers are supervisors in some capacity and generally know an applicant's work history prior to the interview because it is a small campus and generally at least one member of the interview panel has supervised the applicant prior to the interview.

Magee had no opinion of Plaintiff as an employee prior to the interview and no one

expressed their opinion to Magee about Plaintiff prior to the interview. Following the March 2005 round of interviews, no candidate was hired for the position of Building Service Subforeman. Plaintiff does not know why no one was hired at the time. Plaintiff believes no one was hired because of his complaint and that it would have been difficult for Defendant EIU to explain why another individual was promoted ahead of him. However, Plaintiff does believe it is possible other applicants may have interviewed better and been more experienced than him. He has no specific facts to support his claim that no one was hired for this promotion because of his complaint.

Sometime after the interview Plaintiff made his complaint about the Chief shirts to the Office of Civil Rights at EIU. Defendant EIU was proactive in educating employees about behaviors that might be offensive. Plaintiff supported the Office of Civil Rights' proactive approach. Employees at EIU were encouraged to file any kind of complaint they felt was necessary with the Office of Civil Rights. Plaintiff felt he could make any complaint he felt was necessary to the Office of Civil Rights. Nothing dissuaded him from making a complaint of discrimination or filing a grievance with the union throughout his years of employment at EIU.

Plaintiff interviewed for a promotion again in October 2005. He thought he did well in the second interview, but does not know how any of the interviewers rated him. In his October 2005 interview for a promotion, no one wore anything Illini-related or anything offensive to Plaintiff. The NCAA tournament was over by the second interview. During the second interview, there was a picture of a Native American on the back wall. Plaintiff was not offended by this picture and thought it was a respectful and good portrait. Plaintiff is offended by Native American depictions in sports mascots. He believed his attendance record at EIU was pretty good, but he took time off that was prescribed. He admits that he was tardy occasionally, but

was never disciplined for being late. In the interview, McElwee asked Plaintiff about his attendance record. Plaintiff replied that his attendance was good, but he took time off that he was allowed based on the vacation time he accrued. Plaintiff also understood that he could not take any time off he wanted as a subforeman and that his attendance was required more than just normal. McElwee also had a concern that Plaintiff was not cleaning an area that he was supposed to be cleaning one summer. McElwee though Plaintiff did "pretty good" during his interview. For Magee, nothing stood out about Plaintiff's interview and he does not recall anything about Plaintiff's interview at all.

Plaintiff asked Steve Gilbert and Valerie Leonard (two of the interviewers) how he performed in his interview. Gilbert thought Plaintiff had a good interview, but did not stand out. Leonard thought he did a good job at the interview. Of all the candidates she rated, Leonard rated Plaintiff the lowest. Plaintiff was shown a sheet of how everyone scored him, but does not remember how each interviewer scored him now. He also does not know how Magee and McElwee scored him after the second interview. He does not know how the scoring process takes place for interviews, the years of experience or qualifications of the other candidates, or the attendance records of the other candidates. Plaintiff claimed that candidate Michelle Kusterman's (who got one of the positions) attendance record was not very good, but that was based on his own observation and not actual information of her attendance record.

Out of 25 possible points, Plaintiff received score of 20 from Valerie Leonard, a 17 from Kevin Larkin, a 19 from Steve Gilbert, a 19 from Herb McElwee, a 16 from John Sigler, and an 18 from Travis Magee, for a total score of 109 points. His lowest score was a 16 from John Sigler and his highest was a 20 from Valerie Leonard. Three candidates, Michelle Kusterman,

Michael Goodson, and Stan Evermon were given the position of Building Service Subforeman after the October 2005 interviews. These individuals had the highest total scores out of all the candidates (Goodson: 142, Kusterman and Evermon: 131 each). Plaintiff did not believe Goodson should have been promoted, because he had heard Goodson was fired from Wal-Mart for theft of merchandise and time. Plaintiff also heard that Goodson had received a written warning about racial comments he had made and that Goodson did not do a good job. Plaintiff also claimed Kusterman should not have been promoted because of an incident once where, when students were moving out of the dorms, Plaintiff called Kusterman and told her she needed to return to work, but she never did. Plaintiff also did not believe Evermon should have been promoted based on what others who had worked with him said.

Plaintiff believes he was not hired because of his complaints and his status as a Native American and his viewpoints. He does not believe it has anything to do with his job performance or interview. He thought he performed his job well because he received awards from students and the Student Council, but admits that he never received awards from people who supervised him.

Included in Defendant's Reply to Plaintiff's Memorandum of Law In Response to Motion for Summary Judgment (#29), Defendant's included, as an attachment, a "Discrimination and/or Sexual Harassment Intake Form" filed by Plaintiff on October 25, 2005. Alleging discrimination, Plaintiff wrote:

> "On 10-13-05 I was interviewed for a subforeman position. While I feel I was clearly one of the better candidates I was passed over.
>
> I feel that the reason I was passed over is due to my staunch pride in my

American Indian heritage and my advocacy for native rights and opposition to American Indian mascots, that are vehemently supported by a number of the interviewers. I also believe that my recent complaints of racial comments and perceived actions also have led to the discrimination that I feel I have been the victim of."

Attached as "Exhibit A" to Defendant's Summary Judgment Motion (#23) are the interview data sheets used by the interviewers for the October 2005 subforeman interviews. There is also a score sheet where each of the interviewers wrote down the interviewee names and their respective scores on the 1 to 25 scale. The three highest scores were 142, 131, and 131, and their names were circled. They were promoted. Five other candidates received scores of 123, 115, 113, 109, and 104. They were not promoted. Plaintiff received a 109.

The following facts are those listed as "undisputed" by Defendant, but challenged by Plaintiff that the court, through close and careful review, believes to be undisputed as a result of review of the deposition transcripts. Where necessary, the court will explain its reasoning for including the fact.

McElwee first became aware of Plaintiff's distaste for the Chief after wearing the shirt to the interview. Magee had no knowledge of Plaintiff's position on the Chief controversy.[1]

Plaintiff believed that some employees did not like him because of his political stance on

---

[1]Plaintiff objected to this statement saying that, while it accurately reflects McElwee's and Magee's testimony, a reasonable jury could choose not to believe this statement, as Plaintiff believes they did "know" of his objection to the Chief. However, these are the accurate statements of McElwee and Magee from their depositions. The court sees no reason to exclude them and the reasons suggested by Plaintiff are speculative and conjecture.

the Chief Illiniwek controversy.  By political stance Plaintiff meant that he and a group of Native Americans from around the state had petitioned Governor Ryan and certain Illinois legislators to speak with them about certain issues on Native Americans and Illinois.  Plaintiff also occasionally complained about articles or advertisements in the student newspaper, the Daily Eastern News.  He felt free to complain about anything that he saw as objectionable.  Plaintiff did not receive any discipline or adverse action with respect to his job from making these complaints other than snide comments from coworkers and students relating to his political stance on Native American issues.  Plaintiff could not, however, specifically identify any particular incident, but he just had a general feeling that people did not like him due to his political stance.[2]

Plaintiff resigned voluntarily in February 2008.  He resigned because his job was affecting his moods.  He would get up in the morning and about halfway to work he would get mad at what might happen to him during the day.  No particular incident would necessarily occur; it was Plaintiff's thoughts about what might occur and what he might have to put up with.  His anxiety was due to his political stance on the Chief.  Occasionally Plaintiff felt like he was being put up for public ridicule and wanted to slip back into the cracks, but admits that he voluntarily injected himself into the Chief controversy, complained to the Daily Eastern News, and received news coverage on CNN.  He voluntarily resigned from EIU for his own peace of

---

[2]Plaintiff objected to the inclusion of his own deposition testimony as he said it made it seem as if his complaint was over discrimination based on his "political" stance.  Plaintiff wanted to make clear he felt discriminated against in his status as a Native American minority.

mind because of what he feared might happen, but not for any particular incident.[3]

Plaintiff's Complaint

Plaintiff filed his Complaint (#1) on September 21, 2007.  Plaintiff brought the action under Title VII of the Civil Rights Act of 1964 that prohibits retaliation for complaining of discriminatory conduct.  In the Complaint, Plaintiff states he is a Native American and that in April 2005 he complained to Defendant's civil rights office that he was being discriminated against because of his status as a Native American.  Subsequent to his claims of discrimination, he was subjected to unlawful retaliation in that he was passed over for promotions.  Defendant's actions, Plaintiff claims, violated the anti-retaliation provisions of Title VII and he would not have been denied promotion had it not been for his opposition to discrimination.  As a direct and proximate result of the discriminatory and retaliatory treatment described above, Plaintiff suffered mental anguish, inconvenience, embarrassment, the loss of enjoyment of life and the loss of wages.  Plaintiff asks the court to enter a declaratory judgment determining that Defendant's actions were unlawful, issue mandatory injunctions against Defendant to prevent it from violating Title VII with respect to Plaintiff and directing Defendant to reinstate Plaintiff to the position of employment he would have held had not it not been for Defendant's unlawful conduct, and the award of damages.

Defendant's Answer and Motion for Summary Judgment

Defendant filed its Answer (#11) on November 19, 2007, denying Plaintiff's claim and asserting affirmative defenses such as Plaintiff's failure to make a formal complaint of

---

[3]Plaintiff labeled these facts as "immaterial," but Defendant contends they are material because they show why Plaintiff resigned.  The court agrees with Defendant.

discrimination that forms the basis of his retaliation charge. Defendant filed its Motion for Summary Judgment (#23) on February 9, 2009. In its Motion Defendant advances two main arguments: (1) Plaintiff failed to show that he engaged in a statutorily protected activity when he made his original complaint to the Office of Civil Rights in 2005 because his complaint was over how he was treated due to his political stance, not his status as a Native American and that any later attempt to remedy that must fail; and (2) Plaintiff failed to make a case for retaliation because he suffered no materially adverse employment action since he was passed over for promotion due to his interview performance compared to the other candidates.

Plaintiff filed his Memorandum of Law In Response to Motion for Summary Judgment (#27) on April 2, 2009. Plaintiff argued that (1) he was upset about the Chief shirts that were worn by Magee and McElwee, but the nature of his civil rights complaint was that they were discriminating or harassing him because of his Native American heritage and (2) he was retaliated against by being passed over for promotion and there was a causal factor between his being passed over and his complaints of discrimination. Plaintiff contends those complaints were a motivating factor in his not getting the promotion.

Defendant filed its Reply (#29) on April 16, 2009. The case is now fully briefed and ready for a ruling from the court. As a preliminary matter, however, Defendant has asked that Plaintiff's affidavit attached to his Response (#27) as Exhibit 2 should be stricken because it added additional information after Plaintiff had already provided deposition testimony. Further, the affidavit serves to confuse some of the testimony given by Plaintiff in his deposition. As a general rule, motions to strike are generally disfavored. Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1294 (7th Cir. 1989). Plaintiff's affidavit will not be stricken.

However, the court is confident in its ability to consider only that evidence that is rightfully before it.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(b), "a party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show

what evidence it has that would convince a trier of fact to accept its version of events." <u>Koszola v. Bd. of Educ. of City of Chicago</u>, 385 F.3d 1104, 1111 (7th Cir. 2004). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." <u>Kampmier v. Emeritus Corp.</u>, 472 F.3d 930, 936 (7th Cir. 2007), <u>citing</u> <u>Celotex Corp.</u>, 477 U.S. at 322-23.

ANALYSIS

Defendant advances two main arguments in his Motion for Summary Judgment. The first is that Plaintiff is not entitled to relief under Title VII because his original complaint did not allege discrimination based on race, but rather discrimination based on his outspoken political beliefs. The second argument advanced by Defendant is that there was no materially adverse employment action taken against Plaintiff in retaliation for his complaint. Because the court grants summary judgment for Plaintiff on the second argument, it need not address the merits of the first.

Defendant contends that Plaintiff has failed to show that there was a materially adverse employment action taken against Plaintiff in retaliation for his complaint and also that there was no causal connection between his charge of discrimination and his failure to be promoted. Title VII's anti-retaliation provision prohibits employer actions that "discriminate against" employees because they have "opposed" practices that Title VII forbids or because they have "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." <u>Metzger v. Illinois State Police</u>, 519 F.3d 677, 681 (7th Cir. 2008). A plaintiff alleging retaliation under Title VII can prove their case through either the direct or indirect method of proof. <u>Metzger</u>, 519 F.3d at 681. Under the direct method, direct evidence of retaliation is not

required and circumstantial evidence that is relevant and probative of any of the elements of a direct case of retaliation may be admitted and considered.  Metzger, 519 F.3d at 681.  To support a claim of retaliation, a plaintiff must show through either direct or circumstantial evidence that: (1) they engaged in a statutorily protected activity; (2) they suffered an adverse action taken by the employer; and (3) there was a causal connection between the two.  Under the indirect method, a plaintiff must establish a prima facie case of retaliation by showing that (1) they engaged in a statutorily protected activity; (2) they met their employer's legitimate expectations; (3) they suffered an adverse action; and (4) they were treated less favorably than similarly situated employees who did not engage in statutorily protected activities.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to produce a non-discriminatory reason for its employment action.  If the employer meets its burden of production, the burden of proof then remains with the plaintiff to show that the employer's proffered reason is pretextual.  Metzger, 519 F.3d at 681.

In his Memorandum of Law in Response to Motion for Summary Judgment (#27), Plaintiff states that he relies on the direct method to show the improper retaliation.  Therefore, the summary judgment motion will be analyzed under the direct method.  Again, to support his claim of retaliation under the direct method, Plaintiff must show through either direct or circumstantial evidence that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two. Metzger, 519 F.3d at 681.  Plaintiff argues that he engaged in a statutorily protected activity, that is he went to EIU's internal civil rights office and filed a complaint.  Defendant does not dispute that.  However, even if Plaintiff engaged in a statutorily protected activity, Defendant maintains

that Plaintiff suffered no adverse employment action.  Further, the existence of a causal

connection between the statutorily protected activity and an adverse employment action is also

disputed.

### Adverse Employment Action

The most recent United States Supreme Court case to focus in depth on the "adverse

employment action" requirement was Burlington Northern & Santa Fe Railway Co. v. White,

548 U.S. 53 (2006) (hereinafter Burlington Northern).  The anti-retaliation provision protects

individuals from retaliation that produces injury or harm.  Burlington Northern, 548 U.S. at 67.

Plaintiffs must show that a reasonable employee would have found the challenged action

materially adverse, which can mean that the action taken by the employer might have dissuaded

a reasonable worker from making or supporting a charge of discrimination.  Burlington

Northern, 548 U.S. at 68.  Title VII's anti-retaliation provision prevents employer interference

with "unfettered access" to the statute's remedial mechanisms by prohibiting employer actions

that are likely to deter victims of discrimination from complaining to the Equal Employment

Opportunity Commission (EEOC), the courts, and their employers.  Burlington Northern, 548

U.S. at 68.  Normally, petty slights, minor annoyances, and simple lack of manners will not

create such a deterrence, but the significance of any given act of retaliation will often depend

upon the particular context and circumstances of a situation.  Burlington Northern, 548 U.S. at

68-69.

A recent Seventh Circuit case addressing issues similar to those in question here is

Metzger v. Illinois State Police, 519 F.3d 677 (7th Cir. 2008).  In Metzger, the plaintiff sued the

Illinois State Police (ISP) alleging that when it denied her promotions it violated Title VII by

retaliating against her for having previously filed a sex discrimination suit against it. The plaintiff was a civilian, or "non-sworn" ISP employee (she was not a law enforcement officer). In 1998 she filed a ultimately unsuccessful lawsuit against the ISP saying they violated her First Amendment rights and rights under the Whistleblower Act by retaliating against her for reporting two of her coworkers for taking unauthorized time off and she sued under Title VII alleging sex discrimination. Metzger, 519 F.3d at 678. She was later transferred to the Firearms Services Bureau (FSB) of the ISP. She served as assistant to the manager of the Firearms Owners Identification (FOID) enforcement section. In January 2002, Lieutenant Rick Kahrliker, a sworn officer, became FOID section manager. Because she believed she did the same work as Kahrliker, the plaintiff sought a pay upgrade from Administrative Assistant II to Public Services Administrator (PSA). In February 2002 Kahrliker and the plaintiff submitted a revised job description to Kirk Lonbom, the FSB bureau chief for approval. Lonbom told Kahrliker that he could not promote plaintiff because of budgetary constraints and that her job duties did not warrant PSA classification. In May 2002 plaintiff filed an employment discrimination charge with the Illinois Department of Human Rights (DHR) alleging that the ISP had retaliated against her because of her testimony in the 1998 lawsuit by failing to promote her to PSA in February 2002. The DHR dismissed her claim for lack of evidence in February 2003.

In June 2002 plaintiff requested an audit by the Illinois Department of Central Management Services (CMS) to determine whether her position should be upgraded to PSA. Under the CMS rules, another state agency can request that CMS perform a job audit to determine whether the employee's duties warrant an upgrade in payroll classification. The plaintiff and Kahrliker completed a questionnaire describing plaintiff's job duties. Lonbom

received a copy of it. Lonbom referred to plaintiff's job description as "grandiose" and was concerned the questionnaire had inaccurately inflated the level of responsibility plaintiff had. Lonbom testified that he may have written a memo to CMS setting forth his concern that plaintiff's questionnaire answers were inaccurate. During the CMS audit, Kahrliker reported having a conversation with Lonbom in December 2002 during which Lonbom said he did not care if plaintiff was the "best goddamn" employee in the department, he would never promote her. Metzger, 519 F.3d at 679-680.

CMS ultimately decided against plaintiff and refused to reclassify the plaintiff's position as a PSA instead of Administrative Assistant II. CMS had compared what plaintiff did with other ISP positions and concluded they were typical of Administrative Assistant II positions. At plaintiff's request, CMS initiated a review of its decision, and in August 2003 CMS affirmed its prior order. CMS included a four-page memorandum of how it reached its decision, listing four different sources that they had consulted: Assistant Bureau Chief Larry Grubb; Scot Giles, who had replaced Lonbom as bureau chief; the current official job description for plaintiff's position; and the Position Audit Questionnaire produced by plaintiff and Kahrliker. CMS found that the PSA and Administrative Assistant II positions were not comparable. Metzger, 519 F.3d at 680.

Kahrliker retired and plaintiff, who had previously expressed interest in his job to Lonbom, was passed over as another sworn officer was appointed to replace Kahrliker. In May 2003 plaintiff filed another retaliation charge with DHR, this time alleging that Giles had interfered with the CMS job audit and that the ISP had retaliated against her by not promoting her to PSA to replace Kahrliker. In January 2004 plaintiff filed a federal action in the district court, later amending it to include allegations that the ISP retaliated against her by failing to

17

promote her and interfering with her CMS job audit. The district court, Judge Richard Mills, granted the ISP's motion for summary judgment on all of plaintiff's claims. Metzger, 519 F.3d at 680.

On appeal, plaintiff argued that the district court erred in granting summary judgment on her retaliation claims based on the CMS job audit and the failure of the ISP to promote her to Kahrliker's position. The Seventh Circuit Court of Appeals, Judge Daniel Manion writing, affirmed the district court's granting of summary judgment. Metzger, 519 F.3d at 685. Plaintiff conceded that CMS, not Lonbom, made the decision not to reclassify her position to PSA and that such a concession is ordinarily fatal, since to prevail under the direct method, plaintiffs must provide direct or circumstantial evidence that the decisionmaker has acted for a prohibited reason. Metzger, 519 F.3d at 682. Where a decisionmaker is not completely dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decisionmaker. Metzger, 519 F.3d at 682. The Seventh Circuit found that plaintiff offered no evidence that Lonbom's communication to CMS describing plaintiff's job duties as "grandiose" actually influenced CMS and that plaintiff did not present evidence that CMS's audit was anything but independent from Lonbom's influence. Metzger, 519 F.3d at 682. The court concluded that because there was no evidence that CMS's investigation was anything but independent of Lonbom's influence, the ISP could not be held liable for any alleged retaliatory animus Lonbom held toward plaintiff. Metzger, 519 F.3d at 683.

Plaintiff then asserted that the materially adverse action that formed the basis of her retaliation claim was not CMS's decision denying her a promotion to PSA, but simply Lonbom's

communication to CMS that plaintiff's description of her job duties was "grandiose." <u>Metzger</u>, 519 F.3d at 683. According to plaintiff, a rational employee would likely forego a discrimination claim if they knew a high ranking supervisor would make it more difficult for them to be promoted. The Seventh Circuit acknowledged that may be true in some cases, but found that plaintiff had failed to show her case was one of them. Plaintiff pointed to no evidence in the record to show that Lonbom's characterization of her self-description of her job duties as "grandiose" was, in fact, adverse. <u>Metzger</u>, 519 F.3d at 683. The court found plaintiff failed to create a genuine issue of material fact as to whether the "grandiose" characterization was an adverse action, as there was no evidence in the record that showed she accurately described her duties in the Position Audit Questionnaire and that Lonbom's characterization was therefore false or misleading. Accordingly, the Seventh Circuit found the district court properly granted the ISP's summary judgment motion on plaintiff's retaliation claim based on CMS's job audit and her failure to attain PSA status. <u>Metzger</u>, 519 F.3d at 683.

The court then found plaintiff's claim of retaliation based on the ISP's failure to promote her to Kahrliker's position in May 2003 similarly defective. The court found that the unrebutted evidence in the record showed that Giles, not Lonbom made the decision to replace Kahrliker with a sworn officer. Like the CMS audit, Lonbom may have had some input, but regardless, plaintiff's claim ultimately failed because she produced no evidence undermining Giles's proffered reason for not selecting plaintiff: the other candidate was a sworn officer. There was unrebutted testimony that the position required a sworn officer. Plaintiff disputed the preference for having sworn officers fill the position, but the Seventh Circuit noted that its task was "not to pass judgment on the wisdom of having sworn versus unsworn employee occupy the position of

FOID enforcement section manager."  Metzger, 519 F.3d at 685.  The court, quoting from

another case, noted "this court 'do[es] not sit as a superpersonnel department where disappointed

applicants or employees can have the merits of an employer's decision replayed to determine

best business practices.'" Metzger, 519 F.3d at 685, quoting Blise v. Antaramian, 409 F.3d 861,

868 (7th Cir. 2005).  The court then went on to affirm the decision of the district court granting

summary judgment.

Plaintiff's case contains factors similar to those found in Metzger.  Like the plaintiff in

Metzger, Plaintiff is claiming "[t]here can be little question that being denied a promotion

constitutes an 'adverse employment action' under either the anti-retaliation provisions of Title

VII or the more narrow substantive portions of the law."   Defendant, on the other hand, frames

the question as whether Plaintiff's failure to successfully interview for a promotion is a

materially adverse employment action such that it would dissuade a reasonable worker from

filing a complaint when there is no evidence that the interview process was tainted by retaliatory

animus.  Plaintiff is left, insists Defendant, with challenging the interview process as somehow

retaliatory for filing a complaint with the Office of Civil Rights.

Unfortunately for Plaintiff, there is no evidence that Plaintiff's unsuccessful interview for

the subforeman position constituted a materially adverse employment action such that it would

dissuade a reasonable worker from filing a complaint.  This court agrees with Defendant that

there simply is no evidence that the interview process was tainted by retaliatory animus.

First, the court must start with the interview process itself.  The interviews were

conducted by a panel of supervisors: Magee, McElwee, Valerie Leonard, Kevin Larkin, Steve

Gilbert, and John Sigler.  The interview panel asked a list of questions provided by Human

Resources, and Plaintiff testified in his deposition that all of the questions at the October 2005 interview focused on his performance as an employee and he had no evidence to suggest they deviated in any manner from the script. Following the interview, Plaintiff, as were all the other candidates, was judged on five criteria: (1) related work experience; (2) supervisory experience; (3) ability to work with and lead others; (4) problem-solving ability; and (5) attendance at work. After each interviewer tallied their score, the panel discussed Plaintiff, but no panel member changed their score as a result of the discussion. Plaintiff has no evidence that the interview process itself was tainted with any sort of impropriety. Looking at the score sheet for each interviewer, they all scored Plaintiff about the same, ranging from 16-20. There was testimony that each interviewer had an equal role in the decision making process of choosing an individual for promotion and there is no evidence that any one member of the panel exerted any undue influence over the rest of the group.

Turning to the two interviewers Plaintiff has made the central focus of his complaint, McElwee and Magee, there is likewise no evidence that either of them used their position as panel members to retaliate against Plaintiff for his complaint to the civil rights office over their wearing of Chief Illiniwek shirts. First, it needs to be noted that on the day of the first interview, March 24, 2005, the University of Illinois Fighting Illini men's basketball team was playing in the NCAA Tournament Sweet 16 that very night against the University of Wisconsin-Milwaukee. Up until that point, the team had lost only one game all season and was favored by many to get to the NCAA Final Four and possibly even win the national championship. It was the best Illinois basketball team since the 1989 Final Four team. Therefore, it is not out of the ordinary to assume that many, many people in Illinois, in particular central Illinois, would be

wearing Illini-related gear to support the team. There is no evidence that Magee or McElwee singled out Plaintiff in any way for their wearing of the shirts. The day of Plaintiff's interview just happened to coincide with the day the Illini were playing in the Sweet 16. In fact, when Plaintiff had his October 2005 interview, after he had made the complaint, neither McElwee or Magee were wearing Illiniwek shirts, as the NCAA tournament was over. Further, McElwee and Magee both testified that there were not aware of Plaintiff's stance on the Chief or his feelings about Illiniwek imagery. Whether or not those statements are true is up to question, as Plaintiff contends he was on CNN and his stance on the subject was well known and Magee and McElwee had worked with him for years. However, their testimony is unrebutted in the record that they were not aware of Plaintiff's beliefs before the interview. Plaintiff has no evidence they knew besides his own suspicions. Plaintiff's claim that another employee had told him that Magee and McElwee said they were going to wear the shirts regardless of what Plaintiff thought is hearsay and will not be considered by the court.

Looking at how Magee and McElwee scored Plaintiff at the October 2005 interview also does not show any animus towards him. Herb McElwee scored Plaintiff a 19, which was the lowest score he gave any candidate. However, *he gave four other candidates the same score of 19*. None of those candidates was selected for a promotion. McElwee gave the three candidates who were selected scores of 24, 23, and 22. Moreover, compared to the other interviewers, McElwee gave Plaintiff one of his highest scores. The only interviewer who scored Plaintiff higher was Valerie Leonard, who scored Plaintiff a 20. Travis Magee scored Plaintiff an 18, still higher than two other interviewers. Magee testified that nothing stood out about Plaintiff from the interview and McElwee thought Plaintiff "seemed to do pretty good" during the interview.

There is no evidence that either Magee or McElwee, at the October 2005 interview, retaliated against Plaintiff by using any influence or scoring him far below a reasonable point range so as to ensure denying him of the promotion.

There is also no evidence that any of the other interviewers retaliated against Plaintiff over his Chief-shirt related complaint by failing to promote him.  Plaintiff makes no allegations concerning John Sigler or Valerie Leonard.  Leonard, in fact, tried to help Plaintiff out about where to file his civil rights complaint.  Plaintiff sought to enter evidence via affidavit that two other of the interviewers, Kevin Larkin and Steve Gilbert, were biased against him.  Plaintiff claims that Gilbert once told him that he did "not know his place."  This was over a petition to Governor George Ryan in the 1990s to see Gov. Ryan regarding Native American issues.  However, the context for this statement has nothing to do with the issue at hand.  It took place back in the 1990s and regarded Plaintiff's attempts to get to see Governor Ryan.  The statement does not show any animus towards Plaintiff over his filing a charge of discrimination against Magee or McElwee.  Further, it is in no way related or in any way connected with the interviews that took place in 2005.  Plaintiff has cited no other evidence regarding Gilbert that would show him to be biased against him so that he would deny him a chance at promotion.  Likewise with Kevin Larkin.  In his deposition, Plaintiff testified as to an incident with Larkin in 1994 or 1995 when Plaintiff was teased by students due to his appearance.  Larkin made a statement to Plaintiff to the effect of if Plaintiff would cut his hair and act like everyone else, he would not have as many problems.  While the statement may seem insensitive, there is no evidence of animosity or hostility to Plaintiff so as to lead to retaliation by Larkin during the 2005 promotion interviews.  If anything, Larkin's statements may be a ham-handed attempt at advice or

assistance.  Still, the statement was made 10 years before the incident at issue in this case.  There has been no further evidence provided by Plaintiff with regard to any bias Larkin may have against him related to the 2005 interviews.  The isolated statements of Gilbert and Larkin, two separate incidences in more than a decade of working with Plaintiff, do not give rise to evidence that they used their positions on the interview panels to retaliate against Plaintiff to dissuade him from filing civil rights charges by not promoting him.

Again, the scoring of the panel members themselves in the October 2005 interviews undercuts the suggestion that the remaining four interviewers (besides Magee and McElwee) were biased against Plaintiff and retaliated against him for bringing the civil rights complaint. Valerie Leonard, whom Plaintiff had no problem with, scored Plaintiff a 20, the highest of any interview panel member.  However, the 20 she gave Plaintiff was also the lowest score she gave to any of the other candidates, except one other candidate, whom she also scored a 20.  John Sigler, an interviewer who Plaintiff did not have any problem with, scored Plaintiff a 16, the *lowest* of any panel member.  Steve Gilbert, who Plaintiff accuses of making the statement that he "did not know his place," scored Plaintiff a 19, Plaintiff's second-highest score (tied with the 19 awarded him by Herb McElwee, one of the Chief-shirt wearers).  Kevin Larkin, who made what could be construed as an insensitive statement 10 years earlier, scored Plaintiff a 17.

As with McElwee and Magee, Plaintiff has provided no evidence that any of the panel members deliberately scored him poorly to retaliate for his filing of a civil rights claim and to dissuade him from filing future claims.  Plaintiff simply did not interview well.  Of the eight people who interviewed, only three were hired.  Plaintiff was one of the unlucky five, or 60% of those who applied, who did not get promoted.  From all the evidence before the court presented

by the parties, none of it points to the interview panel taking anything into consideration besides work history and candidate performance at their interviews. Plaintiff also complains that he was not hired after the initial March 2005 interview, and attributes that to his stance on Native American issues and filing of a civil rights complaint, but it must be noted that *no candidate* was hired after the March 2005 interviews, necessitating the October 2005 round. As the Seventh Circuit stated in <u>Metzger</u>, it is not the job of the court to sit as a "superpersonnel department" where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices. <u>Metzger</u>, 519 F.3d at 685.

Plaintiff has raised other claims in his Response about the other candidates and the objectivity of the interview process. The other candidates are not germane to his claim of retaliation. As for the objectivity of the interview process, no interview can be completely objective. There were subjective elements to the interview process. However, again, there has been no evidence presented by Plaintiff as to any retaliatory intent on the part of the interviewers to dissuade Plaintiff from filing a civil rights claim. Plaintiff did in fact file a civil rights claim. He has been outspoken in his pursuit of Native American rights. There is no evidence that Plaintiff was ever intimidated or felt dissuaded from filing a civil rights complaint by the actions of Defendant. In conclusion, Plaintiff has failed to show that there is a genuine issue of material fact as to whether his failure to be promoted to Building Services Subforeman following the October 2005 interviews was a materially adverse action on the part of Defendant, as there is no evidence in the record that shows any member of the interview panel retaliated against him for filing his civil rights claim following the March 2005 interview. See <u>Metzger</u>, 519 F.3d at 683.

For the foregoing reasons, Defendant's Motion for Summary Judgment (#23) is

GRANTED.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#23) is GRANTED. Judgment is entered in favor of Defendant and against Plaintiff.

(2) Defendant's Motions in Limine (#30), (#31), (#32), (#33) filed on May 1, 2009, are hereby found MOOT.

(3) This case is terminated.

ENTERED this __4th__ day of May, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE